BLINDER, ROBINSON & CO.,
INC., Petitioner,

v.

SECURITIES & EXCHANGE
COMMISSION, Respondent.

Meyer BLINDER, Petitioner,

v.

SECURITIES & EXCHANGE
COMMISSION, Respondent.

Nos. 87–1080, 87–1086.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 3, 1987.

Decided Jan. 15, 1988.

Arthur F. Mathews, with whom David M. Becker, Andrew B. Weissman, David D. Rosskam and Karen A. Getman, Washington, D.C., were on the brief, for petitioner Blinder, Robinson & Co., Inc.

Nathan Lewin, with whom Jonathan B. Sallet and Mary L. Lyons, Washington, D.C., were on the brief, for petitioner Meyer Blinder.

Jacob H. Stillman, Associate General Counsel, and Rosalind C. Cohen, Asst. General Counsel, S.E.C., with whom Daniel L. Goelzer, General Counsel, Paul Gonson, Sol., and Thomas L. Riesenberg, Senior Special Counsel, S.E.C., Washington, D.C., were on the brief, for respondent.

Before RUTH BADER GINSBURG and STARR, Circuit Judges, and GESELL,[*] District Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge STARR.

Concurring opinion filed by Circuit Judge RUTH BADER GINSBURG.

STARR, Circuit Judge:

These petitions for review challenge an order by the Securities and Exchange Commission imposing sanctions on a registered broker-dealer and its president and principal shareholder. The petitioners advance a number of contentions, both constitutional and nonconstitutional in nature. For the reasons that follow, we vacate the Commission's order and remand the case for further proceedings.

[*] Sitting by designation pursuant to 28 U.S.C. § 292(a).

## I

This litigation pits the SEC against Blinder, Robinson & Co. (and its principal), a leading broker-dealer in the genre of securities known as "penny stocks." The action arose out of an investigation into the actions of Blinder, Robinson and its president, Meyer Blinder, in underwriting an initial public offering of securities of American Leisure Corporation between December 1979 and March 1980. The purpose of the offering was to provide start-up funds for American Leisure's proposed casino project in Atlantic City. In the course of the offering, Blinder, Robinson took a variety of steps destined to be challenged by the SEC. In particular, the Commission assailed Blinder, Robinson's undisclosed purchase for its own account of almost 1 million units of the 12–million unit offering;[1] a host of other violations were alleged as well, including violations of the antifraud provisions of both the Securities Act of 1933 and the Securities Exchange Act of 1934.

Based on these allegations, the Commission brought a civil enforcement action pursuant to its statutory authority under section 20(b) of the 1933 Act, 15 U.S.C. § 77t(b) (1982), and section 21(d) of the 1934 Act, 15 U.S.C. § 78u(d), against both Blinder, Robinson and Meyer Blinder in the United States District Court for the District of Colorado. After a full trial, the district court entered findings of fact and conclusions of law, which are reported at 542 F.Supp. 468 (D.Colo.1982). The comprehensiveness of the district court's thorough and careful opinion renders it unnecessary for us to recanvass the underlying facts. It suffices for present purposes to observe that the district court in Colorado found that (1) both Blinder, Robinson and

Meyer Blinder had violated the antifraud provisions of the securities laws, 15 U.S.C. 77q(a), 78j(b), 78o(c) and various rules promulgated thereunder, including Rule 10b–5; (2) the defendants had failed to establish a claimed defense of good-faith reliance on counsel and that, to the contrary, the firm had refused to follow the advice of counsel; and (3) comprehensive injunctive relief was appropriate, as articulated in nine specific subparagraphs set forth in 542 F.Supp. at 481–82.

Blinder, Robinson and Meyer Blinder took an appeal to the Tenth Circuit, which in due course affirmed entirely the district court's judgment. *SEC v. Blinder, Robinson & Co., et al.* [1983–1984 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,491 (10th Cir. 1983). The Supreme Court thereafter denied certiorari. 469 U.S. 1108, 105 S.Ct. 783, 83 L.Ed.2d 777 (1985).

As the foregoing litigation was proceeding through the appellate process, the SEC instituted an *administrative* proceeding against Blinder, Robinson and its president pursuant to section 15(b)(4) of the 1934 Act, 15 U.S.C. 78o(b)(4). That provision authorizes the Commission to impose sanctions on broker-dealers if, after notice and hearing, it determines that sanctions are in "the public interest." The stated purpose of the proceeding was to determine what sanctions, if any, to impose on petitioners by virtue of their conduct during the American Leisure underwriting.[2] *See* Order for Public Proceedings and Notice of Hearing (June 27, 1984), *reprinted in* Joint Appendix (J.A.) at 30.

In due course, a hearing ensued before an Administrative Law Judge. At the outset, the ALJ determined that petitioners could not, under principles of issue and

---

1. The American Leisure offering was on "all or none" terms. "All or none" transactions are ones in which funds paid for stocks by buyers are placed in escrow until a certain date; if the entire offering is not sold out by that date, the deal is cancelled, and the escrowed monies returned. The SEC thus viewed the company's buying for its own account as highly misleading, as it gave the impression that the offering was progressing successfully when it in fact was not.

2. The order provided in pertinent part:

[T]he Commission deems it necessary and appropriate in the public interest and for the protection of investors, that public proceedings be instituted to determine:

 . . . . .

 B. What, if any, remedial action is appropriate in the public interest pursuant to Sections 15(b) and 19(h) of the Exchange Act. J.A. at 34.

claim preclusion, introduce evidence as to any matters addressed in the district court's opinion. Blinder, Robinson describes its fruitless efforts in this respect as follows:

> First, petitioners sought to elicit testimony from Meyer Blinder concerning his reliance on counsel. Second, petitioners sought to introduce oral testimony from one of the principal attorneys concerning the advice to Meyer Blinder. When these requests were denied, petitioners sought to introduce into the record all evidence concerning reliance on counsel that had been before the District Court in the injunctive proceeding. This request, too, was denied.

Brief for Petitioner Blinder, Robinson & Co. at 7–8 (footnotes omitted.)

Largely rejecting petitioners' claims that the firm had undertaken "substantial rehabilitative efforts to ensure that the American Leisure events would not be repeated," *id.* at 9, the ALJ concluded that sanctions should be imposed. Specifically, the ALJ ordered that Blinder, Robinson's registration be suspended for 45 days and that a two-year ban be imposed on Blinder, Robinson's underwriting activities; as to Meyer Blinder, the ALJ concluded that he should be suspended from association with any broker or dealer for a period of 90 days. The ALJ put it this way:

> In light of the egregiousness of the antifraud and antimanipulation violations found in the *American Leisure* injunction opinion ... coupled with the failures of Respondents to establish in the main their claims to fullsome rehabilatative [sic] actions and to a new and genuine dedication to compliance.... it is concluded that substantial sanctions ... are ... in the public interest, but that sanctions of the severity recommended by the [Enforcement] Division are not required in light of the mitigative factors found herein, including the remedial steps actually taken....

Initial Decision (Aug. 30, 1985), J.A. at 517–L.

Neither petitioners nor the SEC staff were enamored of the ALJ's decision.

Both sides therefore appealed to the full Commission. In the order from which review is now sought, the SEC upheld the ALJ's decision and choice of sanctions as to Blinder, Robinson, but increased the sanctions imposed on Meyer Blinder individually, determining that he should be barred permanently from association with any broker or dealer (with the proviso that he could apply for reinstatement after two years). *See* Opinion of the Commission (Dec. 19, 1984), J.A. at 536. In a detailed opinion, the SEC made the following points, among others: (1) petitioners' claims of rehabilitation and reformation were unpersuasive, as evidenced by "wholly misleading" sales presentations and techniques still employed by the firm, J.A. at 547–48; (2) the firm's much vaunted personnel changes since the American Leisure imbroglio were entitled to "little weight," in view of key employees having been beguiled away from Blinder, Robinson by the enticing bid of a competing firm, as well as the tell-tale continuing presence of three high-ranking officers with disciplinary records, and, most importantly, of the firm's continued dominance by Meyer Blinder himself, *id.* at 549; and (3) the sanctions imposed by the Commission, while stringent, were necessary to guard against "any repetition of the blatant misconduct in which respondents engaged." *Id.* at 550.

The Commission expressly recognized the gravity of its decision:

> We recognize the serious effect of the sanctions we are imposing. But we are convinced that lesser sanctions will not suffice. Our action is designed to protect the public interest not only by restricting respondents' future activity in the securities business but also by deterring them from any repetition of their violative practices. The sanctions are a clear message to registrant, and to Blinder if and when he returns to the securities business, that any recurrence of misconduct will be dealt with severely. At the same time, the sanctions serve the important purpose of general deterrence, and should operate as a warning to any other participant in the securities indus-

try who might be tempted to engage in similar misconduct.

*Id.* at 550 (citation omitted.) [3]

On New Year's Eve 1986, the Commission entered a stay with respect to the sanctions imposed on Blinder, Robinson. J.A. at 553–56. Applying the criteria articulated by this court, *see, e.g., Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 673–74 (D.C.Cir.1985); *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C.Cir.1977), the Commission denied Meyer Blinder's request for stay. On March 26, 1987, this court, over the opposition of the SEC, entered an order staying the entry of sanctions against Meyer Blinder. *See* Brief for Petitioner Blinder, Robinson & Co. at 10 n. 28.

II

Petitioners assert a variety of grounds for overturning the SEC's order. For ease of discussion, their contentions can be divided into two categories, those arising under the Constitution, and other, nonconstitutional, claims.

A

1. *Separation of Powers*

■ In their broadest line of attack, petitioners contend that the SEC lacked power under the Constitution to seek in federal district court the injunction that provided the foundation for the set of administrative sanctions that the Commission ultimately fashioned. In petitioners' view, an independent agency whose members are secure from removal at the President's will is constitutionally disabled from bringing law enforcement actions, a function entrusted to the Executive under Article II of the Constitution. We decline to entertain this aspect of petitioners' challenge, however, by virtue of the fact that petitioners have previously litigated (and lost) this very issue in the federal district court in Colorado, the appeal of which is currently pending in the Tenth Circuit.

The well-established policies underlying preclusion of relitigation are especially applicable here. The waste of judicial resources would be particularly stark were we to allow petitioners to have another day in court on this question. Two separate Courts of Appeals are being asked to resolve the very same issue, presented by the very same parties, on a single set of facts. We therefore defer to our colleagues in the Tenth Circuit, inasmuch as the issue was first presented, and has been initially resolved, in that circuit. *See Durfee v. Duke*, 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963) (when first court's jurisdiction is actually litigated, a subsequent court must give the first court's resolution preclusive effect); *Stoll v. Gottlieb*, 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938) (same).[4]

■ Petitioners suggest that relitigation is appropriate where, as here, prior court's jurisdiction is at issue. Under those circumstances, petitioners argue, the court's resolution of the issue is open to collateral challenge, citing *Kalb v. Feuerstein*, 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370 (1940), and *United States v. U.S. Fidelity Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940), in support of their position. We

---

**3.** The reference to Mr. Blinder's possible return to the securities business took into account the Commission's proviso that he could apply for reassociation after two years.

**4.** *Chicot County Drainage Comm'n v. Baxter State Bank*, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940), cited by the SEC as support for applying the normal rules of preclusion in this case, is in our view a more difficult case than the present one. In *Chicot County*, the Supreme Court gave preclusive effect to a prior judgment, notwithstanding the fact that the prior court's jurisdiction had been based upon a statute later found to be unconstitutional. The case dealt with a bondholder's suit to recover the value of his defaulted bonds, even though in a prior bankruptcy proceeding a court had effected a reorganization plan (to which the party had notice) which disposed of the issuer's obligations; the constitutionality of the bankruptcy act, and therefore the court's jurisdiction, were not questioned in the first proceeding. The statute on which the bankruptcy proceeding had been founded was later found, in an unrelated case, to be unconstitutional. By contrast to *Chicot County*, in the present case, as in *Durfee v. Duke* and *Stoll v. Gottlieb*, the first court's jurisdictional power was contested and actually decided.

disagree. Properly read, both *Kalb* and *U.S. Fidelity* stand narrowly for the propositions that collateral attack is permitted only when the first court's proceeding "substantially infringe[d] the authority of another tribunal or agency of government," Restatement (Second) of Judgments § 12(2) (1982), or when it improperly trenched on sovereign immunity.[5] The present case is, in our view, unexceptional; having fully litigated (and lost) in Colorado, petitioners, have no persuasive claim to a second try.[6]

For the foregoing reasons, we conclude that precedent supports, and sound policies informing the orderly administration of justice demand, our not entertaining petitioners' constitutional challenge to the SEC's civil enforcement power.

### 2. *Due Process*

In addition to petitioners' jointly advanced separation-of-powers argument, Meyer Blinder argues, separately, that the procedures employed by the SEC and its staff in this dispute run afoul of the Fifth Amendment's Due Process Clause. As Mr. Blinder sees it, the SEC's repairing first to federal court, vigorously litigating against him in that forum, and thereafter imposing Commission-spawned administrative sanctions on him cannot stand in the face of the bedrock constitutional requirement of procedural fairness. Here is the way Mr. Blinder summarizes his claim:

> Having prevailed on its contested lawsuit, the SEC now is seeking to exercise quasi-judicial discretion to decide how severely Mr. Blinder should be sanctioned for the conduct that was the subject of the lawsuit. If the Commission's proposed course is permitted, a plaintiff will have become a judge of its own claim.

Brief for Petitioner Meyer Blinder at 13.

Invoking a line of cases illustrated by the Supreme Court's decision in *In re Murchi-*

son*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), which we shall discuss presently, Mr. Blinder maintains that the Constitution "does not permit ... a transformation of litigation roles" so as to permit a litigant to become a judge in its own case. Brief for Petitioner Meyer Blinder at 13. The infirmity in the SEC's procedures in this instance, Blinder complains, is exacerbated by three additional factors: first, the SEC chose in the first instance to eschew administrative procedures and to resort initially to federal district court, a forum which granted substantial relief to the Commission and which remains available for any agency request for further relief; second, the prejudice wreaked by the SEC's "doffing its litigator's hat" and "donning judicial robes" is especially "acute when the agency, as litigant, has considered and rejected a settlement offer," *id.* at 14; and third, the likelihood of injustice (and its appearance) is "aggravated when the agency continues to engage in active litigation with the party whom it is judging." *Id.*

■ We disagree with Mr. Blinder's analysis. In our view, his approach represents, upon reflection, not merely a narrow attack on the specific procedures employed in his case. Rather, Mr. Blinder's challenge, fairly viewed, represents nothing less than an assault on the constitutionality of a principal feature of the Administrative Procedure Act itself. That familiar statute, enacted by Congress over forty years ago, represents a comprehensive charter for the conduct and operation of modern administrative agencies. Among other things, the APA prohibits agency staff from combining prosecutorial and adjudicative functions in the same case. 5 U.S.C. § 554(d) (1982). *But it expressly exempts agency members from this prohibition of combined functions. Id.*

---

5. In *Kalb,* a state court had exercised jurisdiction over a foreclosure action, even though federal bankruptcy law vested exclusive jurisdiction in the federal courts. In *U.S. Fidelity,* a federal court had issued a judgment requiring certain Indian Nations to pay monies on disputed bonds, in contravention of their sovereign immunity. In both cases, the Supreme Court refused to give the judgments preclusive effect in subsequent suits.

6. We note that the fact that a judgment is pending on appeal ordinarily does not detract from its finality (and therefore its preclusive effect) for purposes of subsequent litigation. *See Martin v. Malhoyt,* 830 F.2d 237, 265 (D.C.Cir.1987), and authorities cited therein.

The permissibility of the APA-sanctioned regime under the Constitution has been strongly suggested (if indeed not settled) by the Supreme Court in the case of *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). There, in recognizing the substantiality of arguments challenging the combination of functions or purposes in a single individual or body, the Court observed that "legislators and [commentators] have given much attention to whether and to what extent distinctive administrative functions should be performed by the same persons. No single answer has been reached. Indeed, the growth, variety, and complexity of the administrative process have made any one solution highly unlikely." *Id.* at 51, 95 S.Ct. at 1466. With this recognition of the problem, the Court, speaking through Justice White, went on to state:

> Congress has addressed the issue in several different ways, providing for varying degrees of separation from complete separation of functions to virtually none at all. For the generality of agencies, *Congress has been content with section 5 of the [APA], which provides that no employee [may combine functions], but which also expressly exempts from this prohibition "the agency or a member or members of the body comprising the agency."*

*Id.* at 51–52, 95 S.Ct. at 1467 (citations and footnotes omitted) (emphasis added).

In its discussion of applicable precedent, the *Withrow* Court carefully distinguished Mr. Blinder's featured case, *In re Murchison.* At issue in *Murchison* was the constitutionality of a Michigan law authorizing a judge of any court of record in the State to act as a one-man grand jury. Faced with this unusual statute, the Supreme Court found a due process violation in Murchison's conviction before a judge who tried him for contempt arising out of his, Murchison's, testimony before the same judge acting as a one-man grand jury. The basic teaching of *Murchison* was this:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome.

349 U.S. at 136, 75 S.Ct. at 625.

Interpreting this broad statement, the Court in *Withrow* expressly distinguished the situation of administrative agencies from the prototypical situation of a judge performing combined functions. *"Murchison* has not been understood," the *Withrow* Court stated, "to stand for the broad rule that the members of an administrative agency may not investigate the facts, institute proceedings, and then make the necessary adjudications." 421 U.S. at 53, 95 S.Ct. at 1467. Indeed, Justice White continued, "[t]he [*Murchison*] Court did not purport to question ... the Administrative Procedure Act." *Id.*

*Withrow's* qualification of *Murchison's* broad teaching is further illustrated by the Court's treatment of one factual twist in *Withrow* itself. The facts of *Withrow,* briefly stated, were these: one Dr. Larkin had obtained a license to practice medicine in Wisconsin from a state-created Examining Board, composed of practicing physicians. In due course, the Examining Board sent Dr. Larkin a notice that it would hold an investigative hearing, as authorized under state law, to determine whether he had engaged in certain proscribed acts. In the notice, the Board indicated that, based on the evidence to be presented at the investigative hearing, the Board would then decide what action to take, including possibly referring the matter for criminal prosecution or instituting license revocation proceedings.

Dr. Larkin promptly filed an action in federal district court challenging the Board's procedures as violative of the Due Process Clause under the *Murchison* line of authority. In the course of that litigation, the Board was enjoined by the trial court from going forward with its proposed hearing. Faced with that order, the Board went forward, albeit without a hearing, and

issued formal findings of fact and conclusions of law that probable cause existed to believe Dr. Larkin had violated state law. The findings were then forwarded to the state prosecutor for possible prosecution.

In addressing this aspect of the Board's course of action, the *Withrow* Court flatly rejected the contention that this particular tack showed bias or prejudice on the part of the Board. The Court once again invoked the administrative agency model in language that bears directly on the question Mr. Blinder brings before us:

> It is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. *This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law.*

*Id.* at 56, 95 S.Ct. at 1469 (footnote omitted) (emphasis added).

 *Withrow v. Larkin* thus stands as a formidable (if not insurmountable) barrier to Mr. Blinder's due process attack. Undaunted, Mr. Blinder seeks to avoid *Withrow's* pronouncements by suggesting its inapplicability where, as here, the agency chooses first to litigate in federal court, rather than instituting administrative proceedings. We are at a loss to discern a meaningful distinction in the suggested difference. Whether the adversarial proceeding is before an agency-designated ALJ or a federal district court judge, the relationship obviously remains one of adversariness between agency and opponent. Indeed, if anything the difference cuts against Mr. Blinder's position, because he was afforded the not insubstantial advantage of the neutral forum provided by an Article III court, with its attendant procedures and protections (including the rules of evidence and procedure) that may not obtain in an agency adjudication.[7]

Nor does the fact that the Commission considered and rejected Mr. Blinder's offer of settlement alter our analysis. Offers of settlement are in the very nature of the litigation process; common experience tells us that neither consideration nor rejection of an offer of settlement contains within it the inherent likelihood of bias and prejudice. Settlement offers are rejected day in and day out for a multitude of reasons; but rejection of a settlement offer does not suggest prejudgment, much less bias, on the part of an administrative agency. If in *Withrow v. Larkin* the Examining Board's issuance of formal findings of fact and conclusions of law did not suffice to establish bias, then the SEC's rejection here of a settlement offer is even farther away from constitutionally forbidden territory.

Our conclusion in this respect is reinforced by (but by no means conditioned on) the fact that, as Mr. Blinder describes it, only one Commissioner who participated in the order imposing sanctions had participated in the earlier consideration and rejection of the settlement offer. It would be a strange rule indeed that inferred bias on such a tenuous basis, and then presumed that the bias spread contagion-like to infect Commissioners who were not even called upon to consider the settlement offer. To do so would manifest profound disrespect for Congress' deliberately structuring agencies as (typically) multi-member bodies, with staggered terms and with requirements that the President appoint a certain number of members from the political party other than his own. To give credence to Mr. Blinder's dark suspicion of bias notwithstanding this carefully crafted structure would flout what Justice White, in writing for the Court in *Withrow*, called "a

---

7. Mr. Blinder suggests that when the SEC engages in highly publicized litigation of the sort that ensued in Colorado, the resultant placing of "institutional prestige" on the line impermissibly adds to the appearance, if not actuality, of injustice. We reject this argument as well. The concept of "institutional prestige" relied on by petitioners is in severe tension with fundamental premises of the administrative state. One of those premises is that *institutions* may competently perform diverse functions. At the agency level, our law assumes integrity in individual members, and requires direct evidence of bias, or some other personal interest, to overcome that assumption.

presumption of honesty and integrity" on the part of those who serve in office. *Id.* at 47, 95 S.Ct. at 1464.[8]

In short, we believe that Mr. Blinder has failed to heed *Withrow*'s message that a due process challenge directed broadly to combinations of purposes or functions in the modern administrative state "assumes too much." *Id.* at 49, 95 S.Ct. at 1465. As in *Withrow* itself, acceptance of Mr. Blinder's broad due process attack would transmogrify the sensible holding of *Murchison*,[9] and in the process accede precisely to what the Supreme Court has twice warned against, namely a sweeping due process challenge that " 'would bring down too many procedures designed, and working well, for a governmental structure of great and growing complexity.' " *Id.* at 49–50, 95 S.Ct. at 1465–1466, *quoting Richardson v. Perales,* 402 U.S. 389, 410, 91 S.Ct. 1420, 1432, 28 L.Ed.2d 842 (1971).

Mr. Blinder argues, finally, that the district court in Colorado remains open for the SEC to seek any relief in addition to that which it previously sought and secured in that forum. This is, upon analysis, a policy argument, not one sounding in due process. This is particularly true in the circumstances of this case, where the SEC did not seek to obtain specific sanctions (save for injunctive relief) in district court against Mr. Blinder and his firm. The subsequent administrative proceeding therefore does not, fairly viewed, constitute a second bite at the apple for an agency that had failed to convince an Article III judge of the merits of a particular remedy. Instead, based upon the district court's judgment, the SEC subsequently initiated procedures expressly ordained by Congress in section 15(b)(4).

This, we are satisfied, does not run afoul of any values of fundamental fairness embodied in the Due Process Clause. Indeed, to accept petitioners' broadside would do violence to the core value of flexibility (coupled with appropriate procedural protections) that has been the hallmark of the modern administrative process.

Indeed, a moment's reflection suggests that acceptance of Mr. Blinder's claim under the Due Process Clause would do considerable violence to Congress' purposes in establishing a specialized agency to regulate in the difficult and challenging world of financial markets and securities regulation. Ironically, the wisdom of Congress' handiwork is suggested by the brief of Mr. Blinder's own firm, whose words, we believe, aptly capture the considerations informing Congress' policy choice in this respect:

> While courts are best equipped to adjudicate whether statutory violations occurred, Congress believed the SEC's particular expertise would best enable it to choose among available administrative disciplinary sanctions and to discern the interests of the investing public.

Blinder, Robinson Brief at 43 (footnote omitted).

In sum, to accept Mr. Blinder's argument would be to work a revolution in administrative (not to mention constitutional) law, in the face of repeated cautionary signals from the Supreme Court. We decline the invitation to storm the barricades and, instead, content ourselves with following what seems to us the clear teaching of the Supreme Court that a fundamental aspect of the modern administrative state is not

---

**8.** Blinder's argument that the SEC must be biased as it continues in litigation with him is but another chapter of the same book. The foundation of his argument is flawed for the reasons already given in the text; the mere fact that litigation goes on hardly suggests that the Commissioners, with their broad ranging areas of responsibility over the wide world of securities markets, have succumbed to bias and prejudice against a single firm and its president.

**9.** We set aside as inapplicable those cases involving a possible financial interest on the part of a decisionmaker. *See, e.g., Gibson v. Berry-*

*hill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (which expressly reserved the issue subsequently addressed in *Withrow v. Larkin* ). Indeed, the great English case cited by Mr. Blinder, *Dr. Bonham's Case,* 8 Eng.Rep. 114a (Com.Pl. 1610), involved just such a financial interest. There, in a memorable opinion by Lord Coke, the Royal College of Physicians was prevented from disciplining a doctor if the College had the right to receive any part of the fine. While edifying, *Dr. Bonham's* case and its progeny have no bearing on the issue before us.

founded upon a violation of the Due Process Clause.

### 3. *Fourth Amendment*

Blinder, Robinson devotes a few pages of its brief to the proposition that the SEC's disciplinary sanctions are infected with an underlying Fourth Amendment violation and thus cannot stand. As we understand the point, Blinder, Robinson maintains that the Formal Order of Investigation which led to the initial district court proceeding was unconstitutionally broad. This order, employed by the staff over 17 months after its issuance as the basis for investigating the American Leisure offering, "constituted a broad warrant supposedly authorizing the SEC staff to undertake an investigation, with administrative subpoena power, of a virtually unlimited range of conduct by Blinder, Robinson over an open-ended period of time." Blinder, Robinson Brief at 35. Blinder, Robinson condemns the investigative order as a general grant of surveillance power over the entirety of the firm's activities for an indefinite period of time. This, Blinder, Robinson complains, cannot be countenanced under the Fourth Amendment.

So framed, the argument appears to be an attack on the validity of the Colorado district court injunctive proceeding. And indeed, so it is. As such, it is doomed to fail, for even if the 1978 Formal Order could be viewed somehow as constituting an intrusion for purposes of Fourth Amendment analysis, a proposition which we need not address and with which the Commission emphatically disagrees, we will not entertain this untimely collateral attack on the Colorado proceedings. Those proceedings provided the time and the place for advancing any such claims of illegality; it is simply too late in the day to litigate issues that could have been adjudicated in the courts of the Tenth Circuit. Indeed, the record in this hydra-headed litigation reflects that the issue was in fact litigated by Blinder, Robinson in a separate action brought against the Commission and its staff, seeking injunctive and other relief on account of asserted Fourth Amendment violations. That action, the procedural history of which is described in one of the Tenth Circuit's opinions in this litigation, *Blinder, Robinson & Co., Inc. v. SEC*, 748 F.2d 1415, 1417–18 (10th Cir.1984), indicates that twelve days before the SEC filed its complaint in federal district court in Denver, Blinder, Robinson and Mr. Blinder repaired to the same court in an attempted preemptive strike. That litigation ultimately ended with a whimper, namely an appellate determination of mootness, *see id.* at 1418–19. But in the process of resolving that branch of the litigation, the Tenth Circuit squarely rejected petitioners' efforts to litigate the question of the legality of evidence secured pursuant to subpoenas issued under authority of the 1978 Formal Order. The Tenth Circuit put it this way:

> At the trial [of the enforcement action] counsel for Blinder, Robinson did not object to the introduction of evidence obtained through the investigatory order.
> . . .
> Even assuming that Blinder, Robinson's attorney's failure to object to the allegedly improper evidence was due solely to the negligence of their counsel rather than to deliberative litigation strategy, this would not constitute a sufficient showing to warrant the extraordinary relief sought.

*Id.* at 1420.

Those words were penned by our colleagues in the Tenth Circuit almost four years ago. In view of the passage of time, the attack before us is even more tenuous. Stubbornly, Blinder, Robinson maintains (1) that the disciplinary order under challenge in this case is rooted in the decision of the district court in Colorado, and (2) that the latter decision is illegitimately grounded in Fourth Amendment violations. But the foundation of the argument obviously rests on sand, for the Tenth Circuit has, as we have seen, upheld the district court's injunctive order and ruled that Blinder, Robinson can no longer litigate the question of the legality *vel non* of the evidence (or the lawfulness of the 1978 Formal Order itself). We scarcely need remind counsel that this issue litigated fully in the Rockies cannot now be raised on the Eastern Sea-

board, and indeed that it was utterly inappropriate even to suggest as much.

## B

### 1. Issue Preclusion

In addition to the previously discussed constitutional claims, petitioners contend that the Commission erred in upholding the ALJ's exclusion of evidence proffered by the broker-dealer with respect to the firm's reliance (through Meyer Blinder) on counsel. Specifically, as we alluded to in the factual narrative above, Blinder, Robinson sought in the administrative proceeding to adduce the following evidence before the ALJ: (1) testimony of Meyer Blinder concerning the advice given to him by counsel; (2) testimony from one of the principal attorneys concerning the advice given to Mr. Blinder; and (3) when those requests were denied, the introduction of all evidence concerning reliance on counsel that had been before the district court in the Colorado injunctive proceeding.

The requests were denied by the ALJ on grounds of issue preclusion, inasmuch as the issue concerning good faith reliance on counsel had been litigated in the federal district court and resolved adversely to petitioners. The SEC agreed with the ALJ's determination in this respect, stating that "[t]o allow the introduction of such evidence would permit the very relitigation that the doctrine of collateral estoppel is designed to prevent." J.A. at 541.

 The SEC is wrong. The issue before the district court in Colorado was manifestly not the question before the SEC in the administrative proceeding. As is readily apparent, the SEC litigated in federal court the question of petitioners' *liability vel non* under the securities laws. Armed with the findings of fact (and the entry of broad injunctive relief) of the district court, the SEC then instituted an entirely different sort of proceeding, namely an administrative proceeding under section 15(b) of the 1934 Act. That proceeding was aimed at reaching a completely different determination than resolving the issue of liability, including the question of "good-faith reliance" on counsel. The precise question in the SEC proceeding was whether sanctions should be imposed "in the public interest." Blinder, Robinson makes the argument well:

> This "public interest" determination is separate from and in addition to the SEC's determination as to the existence of the disqualifying conditions necessary for the imposition of any sanctions. As to sanctions, the *extent* to which petitioners sought the advice of counsel, the *clarity* of the advice, and petitioners' reasons for following or disregarding it, in whole or in part, are highly relevant, *even though the reliance on counsel may not have been sufficient to discharge petitioners from the underlying liability for statutory violations.*

Blinder, Robinson Brief at 39–40 (footnote omitted) (emphasis added).

It is important in this respect to draw a clear distinction between the issue before the district court in Colorado—whether Meyer Blinder relied on counsel so as to establish a good-faith defense to liability—and the obviously related, but nonetheless analytically distinct, matter of the circumstances surrounding the lawyer-client relationship. We are in no way suggesting that Meyer Blinder (and, through him, Blinder, Robinson) is at liberty to relitigate the factual question as to whether there was reliance on counsel. That issue has been conclusively decided against him. As the district court expressly found, counsel advised Mr. Blinder to sticker the prospectus, and he chose to reject that advice.

But saying that, and nothing more, is not to state the whole of what is germane to the SEC in exercising its judgment as to the nature and scope of sanctions that are appropriate in the public interest. Unless the SEC is to adopt a sanctioning regime whereby specific offenses call for certain specific sanctions, it seems inescapable that evidence relevant to a party's *degree* of culpability must be considered in deciding that issue. After all, that was the precise issue in the SEC's section 15(b)(4) proceeding: how culpable was Mr. Blinder? In the district court, the issue was quite different.

The finding that Mr. Blinder did not rely on counsel's advice does not tell us about the circumstances surrounding the advice given and Meyer Blinder's rejection of it. Indeed, the district court's opinion did not even address the question in great detail.

In the SEC's administrative proceeding, however, questions of degree were singularly relevant. Mr. Blinder's proffer of evidence in that proceeding was not, and could not have been, directed to litigating the issue of reliance on counsel as relevant to establishing a good-faith defense; rather, it related to the wholly different matter of the entirety of the relationship with counsel (including, for example, why the advice was rejected; which attorney's advice was rejected; the precise nature of the various advice given, *e.g.*, was it absolute and unequivocal, or somewhat flexible in nature, or something else).[10] These latter points go to the question of possible mitigation, notwithstanding the definitively resolved issue of liability and the specific factual determination that Mr. Blinder did not rely on counsel's advice.[11]

Indeed, the strength of petitioners' core argument, that the nature of the administrative proceeding required the SEC to consider evidence relating to Mr. Blinder's degree of culpability, is implicitly conceded by the Commission counsel. As the Commission indicates to us:

> Blinder, Robinson is correct that the district court's judgment is not preclusive as to the issue of what sanctions are required in the public interest.

SEC Brief at 28 n. 38 (citation omitted). Yet that is, in effect, precisely what the Commission held. It approved the ALJ's refusal even to consider evidence concerning the relationship(s) with counsel on the theory that to do so would permit relitigation of issues adjudicated in Denver.

That error is not cured, as the SEC lamely suggests, by permitting petitioners to introduce evidence going to other points, such as "their asserted reformation and cessation of deceptive sales techniques." *Id.* The logical fallacy of the SEC's argument is apparent. Admitting evidence on issues a, b and c obviously does not cure a tribunal's refusal to consider evidence on issue d, unless of course issue d is irrelevant to the question to be resolved. But in this instance that cannot be. The "public interest" standard is obviously very broad, requiring that the Commission consider the full range of factors bearing on the *judgment* about sanctions that the expert agency ultimately must render. In reaching that judgment, questions such as the precise nature and details of counsel's advice, and indeed, the totality of the circumstances surrounding the lawyer-client relationships in question, are undoubtedly relevant.

---

10. That is to say, counsel might, hypothetically, provide the following sort of advice: "Course 'x' is beyond question permissible under the securities laws and applicable regulations; no other course is 100 percent clearly permitted. To be completely safe, you should follow Course 'x.'" On the other hand, counsel might advise as follows: "It's not overpowering, but a straight-faced argument can be made that Course 'z' is permissible under the securities laws and applicable regulations. I can't imagine that anyone would go to jail for it, but it's likely to be dicey. You're on much surer and safer ground with Course 'x.' I therefore strongly recommend Course 'x.' Why take chances?"

The foregoing are, of course, only two variations on the same theme. In both hypotheticals, counsel advised in favor of Course x, but each hypothetical carries with it its own peculiar set of nuances. Other themes, and manifold variations on each, are readily conceivable. These matters, it seems to us, can only be adequately appreciated and addressed by the expert agency if it has the full set of facts before it.

11. That possibly mitigating evidence exists is manifest. In determining that counsel's ultimate advice was to sticker the American Leisure prospectus, the district court stated, "[w]hile the evidence is conflicting, the more probable and credible testimony is" that counsel advised against the course of action ultimately chosen by petitioners. *See* 542 F.Supp. at 472. Even conceding that this establishes that Mr. Blinder was not presented with *conflicting* advice as to the proper course of conduct, it tells us nothing about the nature of the advice he did receive, and the circumstances surrounding its rejection. These are matters relating to possible mitigation, which cannot be foreclosed solely because the district court found that Mr. Blinder rejected counsel's advice. Mr. Blinder's conduct, his attitude, indeed, all of the relevant circumstances present in the rejection of counsel's advice, bear on the degree of sanctions that the SEC, as the expert agency, would reasonably deem to be in the public interest.

Blinder, Robinson captures the point admirably:

Precluding petitioners in administrative disciplinary proceedings from presenting all evidence relevant to the issue of sanctions—whether or not previously presented to a District Court—would do violence to the considered allocations of adjudicatory responsibilities.... The statutory obligation placed on the SEC to exercise *its* judgment is not satisfied simply by having the SEC adopt the findings of the District Court.

Blinder, Robinson Brief at 43–44.

We agree. To uphold the SEC's decision here would not only blink at its fundamental error in the treatment of petitioners' attempt to introduce evidence relating to the relationship with counsel, but would also do violence to Congress' intent that the SEC exercise its own judgment in these circumstances. In short, the SEC cannot turn a deaf ear to evidence that should, in reason, bear upon the judgment that the Commission is called upon to render.[12]

#### 2. *APA Challenge*

Both petitioners devote considerable energy to attacking the sanctions imposed by the SEC as arbitrarily severe. We have been provided with the following arguments in particular: (1) the SEC subjects over-the-counter firms to disproportionately unfavorable treatment in comparison to Big Board-member firms that similarly run afoul of statutory or regulatory rules and requirements; (2) the SEC, in violation of fundamental requirements of administrative law, failed sufficiently to justify the harsh sanctions visited on petitioners; and (3) the two-year suspension of the firm from all underwriting and private placement activities exceeds the maximum period of suspension authorized under section 15(b)(4) of the 1934 Act. Impressive decisional authority is summoned to buttress

the first two points, including an opinion by the late Judge Friendly in *Arthur Lipper Corp. v. SEC*, 547 F.2d 171 (2d Cir.1976), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978), where the Second Circuit set forth a variety of factors to employ in evaluating sanctions imposed by the SEC, and an opinion by our colleagues in the Fifth Circuit in *Steadman v. SEC*, 603 F.2d 1126 (5th Cir.1979), *aff'd* 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981), where the court erected a daunting standard to justify permanent exclusion from the securities industry. ("[P]ermanent exclusion from the industry is 'without justification in fact' unless the Commission specifically articulates compelling reasons for such a sanction." *Id.* at 1140 (footnote omitted)).

The SEC invokes, in response, similarly impressive authority supporting the unquestioned proposition that the crafting of an appropriate remedy is peculiarly within the province of an expert agency, and can appropriately be judicially disturbed only where the remedy is "unwarranted in law or ... without justification in fact...." SEC Brief at 11, *quoting Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973). Commission counsel points to the detailed reasons articulated by the SEC in visiting such substantial sanctions on petitioners. The SEC summarizes its position this way:

Given the district court's findings that petitioners engaged in an on-going series of deliberately fraudulent transactions that included a deceptive sales campaign, arranging non bona fide transactions to give the appearance that the [American Leisure] offering was sold out, misleading their own counsel and then ignoring counsel's advice, violating the escrow agreement, failing to return investors' money as required, and engaging in prohibited trading in the putative aftermar-

---

**12.** Our holding in this respect should by no means be interpreted as forcing the SEC to engage in an open-ended inquiry without metes and bounds. It has not been argued to us, and we fail to see how it reasonably could be, that the matter of Blinder, Robinson's relationship with counsel was irrelevant to the choice of

sanctions imposed under the securities laws. Be that as it may, nothing that we say should be taken to cabin the broad discretion that agencies such as the SEC enjoy in determining what evidence is germane to the determination of the "public interest."

ket, this conclusion [as to sanctions] should need no further explanation.

SEC Brief at 12.

In the course of recounting petitioners' manifold sins, Commission counsel suggests that the factors on which the *Lipper* court relied are not present here. Among those are the following:

> Unlike Mr. Lipper, petitioners [in this case] did not seek counsel's advice as to the totality of the conduct held to violate the securities laws; and, on the only issue that they did seek advice, their purchase of [American Leisure] securities, they rejected the advice they received.

*Id.* at 14 (citation omitted). By their own words, then, Commission counsel have indicated the relevance of petitioners' relationship with counsel. Petitioners have been weighed in the balance and found wanting, in part because of their disdain for (or failure to secure) counsel's advice. That failure, as the Commission sees it, plainly related to the conclusion that the American Leisure offering was "permeated with deliberate fraud." *Id.* at 12 (quoting J.A. at 546). But the obvious problem with the SEC's conclusions relating to Mr. Blinder's relationship with counsel is that they assume the Commission had before it the full record germane to determining whether factors such as those emphasized by the *Lipper* court were present. That assumption, for reasons already stated, is ill-founded by virtue of the refusal even to consider potentially relevant evidence.

■ In brief, we are persuaded that the fundamental principle of administrative law that an agency act in a non-arbitrary, non-capricious fashion is necessarily implicated by the SEC's refusal to permit evidence with respect to a salient factor. That is, in meting out sanctions, the Commission cannot adequately weigh the factors that it concedes should be considered without having before it the full set of facts necessary for reasoned consideration.

Thus, our analysis in this section of the opinion is inevitably affected by the Commission's error, discussed in the preceding section, in refusing to consider evidence relating to the relationship with counsel on grounds of issue preclusion. We will therefore not extend further the length of this opinion, which is obviously but another (albeit important) chapter in this long-lived litigation. Instead, we will put down our pen and remand the case to the Commission for further action consistent with this opinion. On remand, the SEC will, of course, be obliged to satisfy the strictures of the APA by articulating an adequate rationale for whatever decision it may reach.

In this regard, we would be less than candid if we did not flag for the Commission our concern that petitioners have mounted a non-frivolous claim that they have been singled out for disproportionately harsh treatment. Petitioners list a series of instances which, they contend, demonstrate that the SEC's hand comes down more heavily on smaller, newer firms than it does on old-line, or at least more established, houses with the "right sort" of exchange memberships. The allegation is thus not simply that penalties have differed from case to case. As the colloquies at oral argument suggested, each case in securities regulation, as elsewhere, is different. Those inevitable differences and gradations in fact can best be discerned and articulated by the Commissioners whose job it is to come to just these sorts of judgments.

But it does not exceed our appropriate function to indicate that we have seen warning signs. What is alleged here are not mere disparities, *see Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 187, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973), but rather an asserted *systemic pattern of disparate treatment*, resulting in predictably, disproportionately harsh sanctions being visited upon firms such as Blinder, Robinson. If the Commission believes that the alarms are false, then it should say so and explain why what might appear to be troubling systemic variances are in fact not such variances at all, or, alternatively, variances justified by the circumstances of this

case.[13] Finally, we emphasize in this respect that the Commission's broad discretion in fashioning sanctions in the public interest cannot be strictly cabined according to some mechanical formula. Nothing that we say suggests in the slightest that the Commission does not enjoy wide latitude in fashioning appropriate sanctions; such latitude is inherent in the Commission's broad grant of power from Congress, and is confirmed by such teachings as the Supreme Court's decision in *Butz.*

\* \* \* \* \* \*

A closing observation is in order: Nothing that we have said today should suggest any intent on our part to intrude into the domain of the previous litigation between these parties in the Tenth Circuit. Petitioners stand condemned for serious violations of the securities laws, and we have held today that it is entirely appropriate and lawful for the SEC to carry out its statutory responsibilities in crafting a suitable and appropriate sanction in response to those violations.

But the Commission must do more than say, in effect, petitioners are bad and must be punished. Petitioners do not stand alone; they are, alas, only two in a long line of enterprises and individuals who have seen fit to conduct themselves in violation of the law of the land. It is because of the SEC's experience in dealing with such unhappy matters that it has the sensitive function, ordained by Congress, of deciding petitioners' fate. In this setting, the Commission is not simply rendering a policy judgment; nor is it simply regulating the securities markets; it is, rather, singling out and directly affecting the livelihood of one commercial enterprise and terminating (possibly forever) the professional career of the firm's founder. Faced with a task of such gravity, the Commission must craft with care.[14]

### III

For the foregoing reasons, the order of the Commission is vacated and the case is

---

**13.** For example, at oral argument, counsel for the Commission chose not to rely merely upon salutary principles of broad agency discretion. To the contrary, counsel stated that in typical cases involving larger, more established firms, such firms ordinarily took prompt, remedial action so as to remove offending officials or employees from the firm. That sort of admirable internal housecleaning, counsel suggested, is a far cry from this case, where, as we previously indicated, various key officials, not the least of whom is Mr. Blinder himself, continue to be involved in the operation of the firm.

Needless to say, we do not pass judgment on this contention, or other possible explanations for the sanction imposed here. It is obviously too late in the day to accept the *post hoc* explanations of counsel, especially where, as here, the Commission was content to rely on mere boilerplate as to the undoubted breadth of its discretion. *See* Opinion of the Commission at 16 n. 36, J.A. at 551.

**14.** It will be apparent to the discerning reader that we have not treated heretofore Blinder, Robinson's contention that the SEC ran afoul of the specific terms of section 15(b)(4) of the 1934 Act, 15 U.S.C. § 78*o*(b)(4), in imposing on Blinder, Robinson a suspension for a period of longer than one year.

The point need not long detain us. Section 15(b)(4) of the Securities Exchange Act, 15 U.S. C. § 78*o*(b)(4), authorizes the SEC to "censure,

place limitations on the activities, functions or operations of, suspend for a period not exceeding twelve months, or revoke the registration of any broker or dealer." Blinder, Robinson argues that it is "clear ... on the face of the statute" that this list of sanctions is in "ascending order of severity," Brief for Blinder, Robinson at 21 & n. 50, so that no "limitations" placed on a broker-dealer's activities may exceed twelve months. In support of a one-year maximum, Blinder, Robinson urges that the order of sanctions was changed in a late draft of the 1934 Act, moving the "place limitations" sanction up from the end of the list to its current position. *Id.*

We disagree. The statute itself indicates that Congress full well knows how to express a time restriction: the Commission, when it suspends the registration of a broker-dealer, may not do so for a "period exceeding twelve months." An analogous section of the 1934 Act, 15 U.S.C. § 78s(h)(1), which provides for disciplinary action against industry self-regulatory organizations, contains virtually the same sanctions as section 15(b)(4) in different order: twelve-month suspension, revocation, censure, imposition of limitations. We also observe that the SEC has consistently interpreted section 15(b)(4) to allow limitations of more than one year's duration. *See, e.g.,* Bruce Zimmerman, 46 S.E.C. 509, 513 (1976) (reversing imposition of indefinite limitations on nonstatutory grounds); Joseph H. Gasperini, 32 S.E.C. Dkt. 1842, 1844–45 (1985) (indefinite limitations).

remanded for further proceedings consistent with this opinion.

*It is so ordered.*

### RUTH BADER GINSBURG, Circuit Judge, concurring:

I join most of the court's fine opinion, but write separately to express some misgivings about the last step my colleagues take. I question the propriety of any remand, particularly one missing well-defined "metes and bounds." *See* court's opinion at 1111 n. 12.

The distinction my colleagues draw between "reliance on counsel" and "relationship with counsel," *see* court's opinion at 1110, slips from my grasp. True, different *claims* were at stake in the Colorado district court and before the SEC, so no claim preclusion operates here. I agree too that a degree of reliance sufficient to count as a mitigating factor in an administrative sanctions determination may be insufficient to constitute a good-faith defense in an injunction proceeding.[1] But degree of reliance never enters into the calculus when there was no reliance at all. Every counsel consulted, the Colorado district court found as a matter of fact, advised against the course of action ultimately chosen by petitioners. *See* court's opinion at 1110 n. 11, citing the Colorado district court's fact finding reported in 542 F.Supp. at 472.[2] As the Colorado district court reiterated, petitioners directly received "the advice of the involved attorneys," and then, with "knowledge of the materiality of their conduct, and its potential consequences, they ig-

nored counsel's advice." 542 F.Supp. at 476–77. *See also id.* at 481.

If Meyer Blinder is not at liberty to urge again that he relied at all on the advice of counsel, then it is difficult for me to comprehend how a "relationship with counsel" can aid his cause. *Arthur Lipper Corp. v. SEC,* 547 F.2d 171 (2d Cir.1976), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed. 2d 752 (1978), is indeed "[i]mpressive decisional authority," *see* court's opinion at 1111, but that case seems to me critically different from the one at hand. Judge Friendly held in *Arthur Lipper* that when securities law violators "act under the supervision of experienced ... counsel," 574 F.2d at 184, SEC sanctions should be mitigated. One who received and "specifically declined to follow" advice of counsel, however, as the Colorado court found Blinder did, 542 F.Supp. at 481, is not largely assisted by precedent sympathetic to a party who acted on counsel's advice. Seeking and then rejecting advice logically should aggravate, not mitigate, blameworthiness.

I note, further, that my colleagues appear to have entrusted to the Commission a comparative analysis obligation heavier than any that has gone before. *See, Butz v. Glover Livestock Comm'n Co.,* 411 U.S. 182, 187, 93 S.Ct. 1455, 1459, 36 L.Ed.2d 142 (1973) ("employment of a sanction within the authority of an administrative agency is ... not rendered invalid in a particular case because it is more severe than sanctions imposed in other cases").

In sum, before returning a case to an agency, I believe a reviewing court has an obligation to specify with great care and

---

1. This is the sole force of the SEC's remark quoted in the court's opinion:

 Blinder, Robinson is correct that the district court's judgment is not preclusive as to the issue of what sanctions are required in the public interest.

 Court's opinion at 1110, quoting SEC Brief at 28 n. 38.

2. The Colorado district court specifically found as fact, after evaluating conflicting evidence, that each counsel had advised Blinder, Robinson it was required by law to sticker the American Leisure prospectus so as to inform investors Blinder, Robinson was itself purchasing the securities it was underwriting. *See* 542 F.Supp. at

472. My colleagues' hypotheticals therefore strike me as inapposite. *See* court's opinion at 1110 n. 10. This was not an instance of counsel advising a client that certain conduct was permissible but dicey; it was a situation in which counsel advised Blinder, Robinson that stickering was *required, i.e.,* that not stickering the prospectus was *im*permissible. Blinder, Robinson did not reject advice that stickering was the better course of conduct; it rejected advice that stickering was the only permissible course of conduct. In that respect, the "precise nature of [each counsel's] advice," court's opinion at 1110, has already been litigated and determined; issue preclusive effect is therefore warranted.

precision the "metes and bounds" for the remand. My colleagues say they do not mean to "forc[e] the SEC to engage in an open-ended inquiry." Court's opinion at 1111 n. 12. I am uneasy, however, about the less than tight instructions the court's opinion contains concerning 1) the limitations now placed on what petitioners and their able counsel may open up or delve into on remand, and 2) what the Commission must do to justify its sanctions. I fear the court's opinion may be read by petitioners to present not limitations as intended, but an opening to introduce anything and everything arguably "relating to the[ir] relationship with counsel." *See* court's opinion at 1110.

There is in the remand course ordered some risk of confusion,[3] and an opportunity to protract. I take it to be the view of all members of the panel that the Commission, while instructed to "craft with care," court's opinion at 1113, is also to be vigilant to guard against undue protraction and deferral of the final disposition of this case.

---

**3.** It should be recalled that petitioners' "fruitless efforts" before the ALJ were, according to petitioners' own description, to introduce evidence concerning Meyer Blinder's "reliance on counsel." *See* court's opinion at 1102 (quoting from Brief for Petitioner Blinder, Robinson & Co. at 7–8). I therefore underscore the court's definitive ruling that the issue whether there was reliance on counsel "has been conclusively decided against [Meyer Blinder]." *See* court's opinion at 1109.